In re CARDINAL INDUSTRIES, INC., In Joint Administration With Cardinal Industries of Florida, Inc., Debtors.

CARDINAL INDUSTRIES, INC., and Cardinal Industries of Florida, Inc., Plaintiffs,

v.

BUCKEYE FEDERAL SAVINGS & LOAN ASSOCIATION, et al., Defendants.

Bankruptcy Nos. 2–89–02778, 2–89–02779.
Adv. No. 2–89–0203.

United States Bankruptcy Court, S.D. Ohio, E.D.

Aug. 18, 1989.

David G. Heiman, John W. Zeiger, Jones, Day, Reavis & Pogue, Columbus, Ohio, for plaintiffs.

Daniel R. Swetnam, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for Buckeye Federal Sav. & Loan Ass'n.

Leonard A. Carlson, Smith & Schnacke, Columbus, Ohio, for AmeriFirst Bank.

Quintin F. Lindsmith, Bricker & Eckler, Columbus, Ohio, for Crossland Sav., FSB.

Stephen C. Sawicki, Hendry, Stoner, Townsend & Sawicki, Orlando, Fla., for Crown Sav. Ass'n.

Don R. Gardner, Keating, Muething & Klekamp, Cincinnati, Ohio, for Florida Federal Sav. Bank.

Leonard H. Gilbert, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for Florida Federal Sav. Bank.

Nick V. Cavalieri, Arter & Hadden, Columbus, Ohio, for Comerica Bank–Detroit.

William M. Todd, Porter, Wright, Morris & Arthur, Columbus, Ohio, for Midland Mut. Life Ins. Co.

John Dilenschneider, Squire, Sanders & Dempsey, Columbus, Ohio, for Cedargate Apartments of Lancaster I Ltd. and certain other partnerships.

Robert T. Wildman, Henderson, Daily, Withrow & DeVoe, Indianapolis, Ind., for Traub and Co., Inc.

Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, and Stuart Hirshfield, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Official Unsecured Committee of Creditors for Cardinal Industries, Inc.

P. Steven Kratsch, Smith, Gambrell & Russell, Atlanta, Ga., and James M. Lawniczak, Calfee, Halter & Griswold, Cleveland, Ohio, for Official Unsecured Committee of Creditors for Cardinal Industries of Florida, Inc.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER ON JOINT MOTION FOR APPROVAL OF SETTLEMENT OF CLASS ACTION

BARBARA J. SELLERS, Bankruptcy Judge.

## I. INTRODUCTION AND JURISDICTION

This matter is before the Court upon the Joint Motion for Approval of Settlement of Class Action filed by the plaintiffs, Cardinal Industries, Inc. and Cardinal Industries of Florida, Inc. (collectively the "Debtors"), and defendants, Buckeye Federal Savings & Loan Association, CrossLand Savings, FSB, Crown Savings Association, and Florida Federal Savings Bank (collectively the "Settling Defendants"). Pursuant to Bankruptcy Rule 7023 and Rule 23(e) of the Federal Rules of Civil Procedure, the Debtors and the Settling Defendants seek the Court's approval of the terms of a compromise as defined in the Stipulation and Agreement of Compromise and Settlement ("Settlement") executed by those parties on June 8, 1989, and filed with the Court that same day.

The Settlement directly addresses claims asserted by the Debtors against the Settling Defendants, three named defendants not joining in the Settlement and a defendant class. Following appropriate notice to

all parties, including all members of the putative class, the Court held a fairness hearing over a 4-½ day period. Numerous parties appeared and participated in that hearing both by calling and cross-examining witnesses and by orally presenting statements to the Court of their positions in the matter. At the conclusion of the hearing the Court took the matter under advisement.

■ Although various parties to this adversary have asserted that the Court lacks jurisdiction to hear this matter or, in the alternative, that this is a non-core proceeding, the Court finds that it has jurisdiction in this proceeding under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district and that this is a core proceeding.

The relief requested by the complaint is a declaration that the provisions of 11 U.S.C. § 362(a) apply to certain interests of these Debtors or, if § 362(a) is not applicable, that this Court should use its powers under 11 U.S.C. § 105(a) to extend the reach of § 362(a) and enjoin all members of the defendant class from proceeding against the Debtors with respect to those interests. Clearly such relief is premised upon provisions of the Bankruptcy Code, is within the jurisdictional grant of 28 U.S.C. § 1334(b), and is, therefore, within the scope of matters referred to this Court by the General Order of Reference entered in this district pursuant to 28 U.S.C. § 157(a).

In determining the procedure for the entry of a final order in this matter, the Court notes that there is no subsection of 28 U.S.C. § 157(b)(2) which expressly reflects these matters. Such subsections are not an exclusive list of matters which are properly characterized as core proceedings, however. The Court perceives few issues which would have greater relevance to its core jurisdiction than those raised by this complaint concerning specific applications of particular sections of the Bankruptcy Code. And to the extent the Debtors request this Court to use its equity powers under 11 U.S.C. § 105(a), this Court may be the only forum where the appropriateness of such relief could be determined. Ac-

cordingly, the Court further finds that this is a core proceeding which this Bankruptcy Judge may hear and determine. *See Knopfler v. Schraiber (In re Schraiber),* 97 B.R. 937 (Bankr.N.D.Ill.1989).

## II. BACKGROUND

### A. *Legal Proceedings*

On May 15, 1989, Cardinal Industries, Inc. ("CII") and its wholly-owned subsidiary, Cardinal Industries of Florida, Inc. ("CIF") filed in this Court petitions for reorganization under Chapter 11 of the Bankruptcy Code. The Debtors manufacture a standardized modular housing unit which they sell to third parties or use in various real estate projects which they develop. Such projects include apartments, motels, retirement villages, single-family homes, student housing, day care centers, and office facilities. CII and its numerous wholly-owned subsidiaries ("the Cardinal Companies") are a vertically integrated business which plans, builds, manages and supplies services and product to those real estate projects from start to finish. To date, the Cardinal Companies have developed over 1,200 such real estate projects in twenty (20) states (the "Property(ies)"). Substantially all of the Properties are owned by limited partnerships (the "Partnership(s)") formed by the Cardinal Companies. Further, in each Partnership, CII or a subsidiary serves as one of the managing general partners.

On May 23, 1989, the Debtors filed this adversary proceeding to obtain declaratory and injunctive relief against a proposed defendant class. The initial complaint named two defendants and sought certification of a defendant class that consisted of all persons and entities which have a claim against a Partnership or a Partnership Property. The two named defendants in the initial complaint were Buckeye Federal Savings & Loan Association ("Buckeye Federal") and AmeriFirst Bank ("AmeriFirst"). Specifically, the Debtors sought two alternative forms of relief against the defendant class: a declaratory judgment that the provisions of the automatic stay set forth in 11 U.S.C. § 362(a)(2) and (3)

apply to all actions against the Partnerships and the Properties, together with ancillary injunctive relief under 11 U.S.C. § 105(a) prohibiting all members of the defendant class from violating the stay; and, in the alternative, an injunction, issued pursuant to § 105(a), that expands the scope of a § 362 stay to include such actions and enjoins all members of the defendant class from pursuing any claims against the Partnerships or the Properties in violation of the expanded automatic stay.

Also on May 23, 1989, the Debtors moved for a temporary restraining order ("TRO") that would have temporarily certified the defendant class for purposes of the TRO, and would have restrained all members of the class from pursuing any action against the Partnerships or the Properties until after determination of the Debtors' request for preliminary injunctive relief.

The Court held a hearing on the motion for a TRO on May 24, 1989, at which time counsel for the Debtors and Buckeye Federal and numerous members of the putative defendant class appeared and participated through counsel. At the conclusion of that hearing, the Court declined to certify the defendant class for purposes of the TRO or to enter a temporary restraining order as broad as the one proposed by the Debtors. However, the Court found that an order granting a portion of the requested relief was appropriate and necessary. Therefore, by a TRO entered the following day and amended one day later, the Court restrained all persons receiving actual notice of that order from taking any action, during the pendency of the order, that would result in either the sale or final disposition of Partnership Property or the entry of a judgment against a Partnership or its Property. That order required certain subsidiaries of CII and a non-related entity, R/E Management Services, Inc., to consent to the jurisdiction of the Court for the purposes of this adversary proceeding. The amendment further prohibited the Partnerships from using rents from the Properties without the consent of the creditor having a security interest in those rents, except for use as payment of normal current operating expenses, including debt service.

On May 31, 1989, the Debtors filed an amended complaint which narrowed the proposed class to include only those persons and entities which have or obtain a mortgage or other security interest in any of the Partnership Properties. In addition, the amended complaint added five named defendants to serve as additional representatives of the proposed defendant class. Those additional named defendants are: CrossLand Savings, FSB ("CrossLand"), Comerica Bank of Detroit ("Comerica"), Crown Savings Association ("Crown"), Florida Federal Savings Bank ("Florida Federal"), and The Midland Mutual Life Insurance Company ("Midland").

On June 1, 1989, the Debtors filed a motion seeking certification of the defendant class pursuant to Rule 23(c) of the Federal Rules of Civil Procedure. The Court scheduled a hearing for June 13, 1989 to consider that motion.

On June 8, 1989, the Debtors and the Settling Defendants executed the Settlement. Contemporaneously, the settling parties filed a motion requesting the Court to approve the Settlement pursuant to Bankruptcy Rule 7023 and Fed.R.Civ.P. 23(e). By an order entered June 8, 1989, the Court scheduled a hearing for June 19, 1989 to determine the fairness of the Settlement. Hearings on the Debtors' motion for class certification and the request for preliminary injunction were rescheduled for June 30, 1989, in the event the Settlement was not approved. The Court further directed, and the Debtors provided, notice to the approximately 300 members of the proposed settlement class of the terms of the Settlement and of the opportunity to appear and be heard. On June 9, 1989, the Court also extended the TRO for an additional ten (10) days, pursuant to Bankruptcy Rule 7065 and Fed.R.Civ.P. 65(b).

On June 15, 1989, Midland, one of three non-settling named defendants, filed a notice of appeal from the June 8 Scheduling Order and the June 9 Order extending the TRO. That appeal was later joined in by the other two non-settling defendants,

Comerica and AmeriFirst. At the same time, Midland filed a Petition For a Writ of Mandamus and/or Prohibition in the District Court (the "Mandamus Petition") challenging both orders, and requesting the District Court to restrain this Court from proceeding with the hearing on the Settlement scheduled for June 19, 1989. The Mandamus Petition was also later joined in by the other two non-settling defendants. On June 16, 1989, the District Court, in order to permit it to hear the Mandamus Petition, entered an order temporarily restraining this Court from proceeding with the June 19 hearing pending the District Court's determination on the merits of the Mandamus Petition.

On June 23, 1989, the District Court entered an Opinion and Order, in which it found that the Mandamus Petition was without merit and should be denied. Also on June 23, 1989, the District Court entered an order, pursuant to Bankruptcy Rule 8005, that enjoined all persons receiving notice of the order from taking any action that would result in the final disposition of Partnership Properties or in a final judgment against a Partnership during the pendency of the appeal from this Court's Orders of June 8 and 9, 1989. The District Court's order imposed the same restrictions and obligations on the Debtors and their subsidiaries or affiliates that had been imposed by this Court's TRO.

On June 28, 1989, Midland, Comerica and AmeriFirst (collectively the "Non-Settling Defendants") requested the District Court to dismiss their appeal of this Court's Orders of June 8 and 9, 1989. The appeal of the June 9 order was in fact moot because the TRO had expired by its own terms on June 23, 1989. Therefore, the only order pending on appeal was the June 8 Scheduling Order.

On July 5, 1989, the District Court entered a Stipulation and Order, pursuant to Bankruptcy Rule 8001(c)(2), in which it dismissed the appeal. The District Court requested that this Court reschedule the fairness hearing for July 27 and 28, 1989. Pending that hearing, the District Court amended its June 23 order to remain in full force and effect. This Court convened its hearing to determine the fairness of the Settlement on July 27, 1989.

### B. Intervention and Exclusion Requests

Prior to the Settlement Hearing the Court received several motions from parties seeking to intervene in this adversary proceeding pursuant to Bankruptcy Rule 7024 and Federal Rule of Civil Procedure 24. Those motions were addressed at the commencement of the hearing at which time the Court inquired of each party whether it sought to intervene solely for the purpose of being heard at the hearing or whether it sought to intervene in some particular capacity.

Counsel for three of the movants indicated a desire to formally intervene in this proceeding due to the unique circumstances of their clients. Those parties were the Official Committee of Unsecured Creditors of Cardinal Industries, Inc. (the "Creditors' Committee"); Cedargate Apartments of Lancaster I, Ltd. and one thousand limited partnerships, more or less, in which CII or an affiliate of CII serves as a general partner ("Cedargate"); and Traub & Company, Inc., as agent and attorney-in-fact representing a majority of the limited partners in several Indiana limited partnerships of which CII was the general partner ("Traub"). Although less certain about the role of the Creditors' Committee, the Court found that intervention by these parties was appropriate. Therefore, the motions to intervene filed by the Creditors' Committee, Cedargate and Traub were granted.

The Court denied the motions to intervene filed by Midlantic National Bank, The York Bank and Trust Company, First McComb Bank and a group of associated banks generally referred to as the Pittsburg National Bank group. These parties sought to intervene as named defendants, but not as class representatives. The Court noted that if the class were certified, granting such motions would place these parties in an ill-defined posture. Therefore, given their right to appear and be heard, the Court found that the rights of these parties were adequately protected

without formal intervention. The Court further stated that the parties were free to renew their motions at a later time if counsel considered it appropriate.

Finally, the Ford Motor Credit Corporation sought to intervene as a representative of the defendant class if the class were certified. The Court reserved its ruling on that motion pending the outcome of the Settlement Hearing.

In addition, thirty (30) putative class members entered into voluntary forbearance agreements with the Debtors prior to the issuance of the ruling on the Settlement. As part of that agreement and upon motion by the Debtors, those parties were excluded from the defendant class by an order entered August 15, 1989.

### C. The Debtors' Business Operations

CII is a privately held Ohio corporation headquartered in Columbus, Ohio. Almost all of its outstanding shares are owned by Austin Guirlinger. Founded in 1954, the hallmark of CII has been the manufacturing of a standardized twelve feet by twenty-four feet (12' × 24') module developed in 1969. As previously indicated, these modules are used in the Partnership Properties and are sold to third parties, either as a developed Property or as units for such third parties' specific uses. The vertical integration of CII and its approximately twenty-five (25) wholly-owned subsidiaries permits the Cardinal Companies to be involved in every aspect of the development of a Property from conception to consumption. The Cardinal Companies are not only responsible for site selection and acquisition, but also financing and construction. Following construction, the Cardinal Companies provide each project with property management and accounting services, refinancing, and even replacement parts. Income from the management services constitutes a substantial segment of the Cardinal Companies' receipts.

Presently, the Cardinal Companies are involved in approximately 1,000 real estate projects. Each project is owned by a Partnership which operates a discrete property or a single phase of a multi-phase property. Of the 1,000 Partnerships, approximately 455 are unsyndicated. In the unsyndicated Partnerships, CII or a subsidiary serves as the managing general partner and one of CII's wholly-owned subsidiaries is the sole limited partner.

The remaining Partnerships are syndicated. Those Partnerships have outside third-party investors who have purchased the limited partnership shares sold to raise equity funds to construct and operate the Properties. The number of outside investors is nearly 10,000 and their total investment is estimated at $425,000,000. CII or a subsidiary also serve as managing general partner of these Partnerships.

Recently, an additional general partner was added to each of the Partnerships. For all but 18 of the Partnerships that new general partner is a corporation known as R/E Management, Inc., an Indiana corporation owned entirely by Austin Guirlinger, the primary shareholder of CII. In the remaining 18 partnerships the new general partner is Red Bird Management Co., Inc., owned by Howard Spies, the in-house general counsel for CII.

Certain changes in the Internal Revenue Code which decreased the tax benefits available to investors in real estate limited partnerships and oversupply in the budget motel market have caused an unexpected financial downturn in the business of the Cardinal Companies. That downturn, coupled with cash flow problems and foreclosure proceedings against certain Partnership Properties, led to Chapter 11 filings in this Court by the parent, CII; one of its subsidiaries, CIF; and 23 of the Partnerships.

### D. Relevant Provisions of the Settlement

Under the terms of the Settlement, all members of the class would be prohibited from taking certain actions against Partnership Properties for a period of one hundred twenty (120) days from the date the proposed final order is entered. Specifically, class members would be prohibited from taking any action resulting in either sale or final disposition of the Properties or the entry of a judgment against a Partnership

or a Property; and after June 8, 1989, from seeking the appointment of a receiver or the enforcement of any loan provision providing for assignment or other protection of rents. The Settlement further would require each class member to take whatever actions are necessary to suspend any scheduled foreclosure sales. Similarly, class members with receivers or other rent protections obtained or put into place after June 8, 1989 would be required to suspend those protections for the duration of the injunction. Correspondingly, receivers in place on or before June 8, 1989 are not suspended by the Settlement, and the Debtors and their management companies must comply with all state court orders appointing such receivers. Compliance would be excused only if a separate Chapter 11 petition is filed for that Partnership or the Partnership obtains relief from the state court initially ordering the receivership.

Unless a separate agreement has been reached with a class member prior to June 8, 1989, the Settlement further provides for the pass-through to the mortgage holders of net revenues from each Property on a monthly basis after normal current operating expenses are paid. The pass-through is limited to the amount of accumulated debt service for each Property on which the class member holds a first mortgage interest or an outstanding letter of credit with respect to such mortgage interest. Available cash is defined as the total cash receipts of a Partnership for the current period less certain expenses for that same period. Expenses deducted from receipts include all normal operating expenses, accruals and payment for current insurance and taxes, payment of any real property tax or utility arrearages, and payment of any other expenses expressly authorized in writing by the first mortgage lender. In addition, accruals sufficient to establish and maintain a working capital reserve of $1,000 for each Partnership are to be subtracted from current receipts.

It is important to note further that normal current operating expenses include all management, marketing and any other fees or charges payable in the ordinary course of business to the Cardinal Companies.

However, payment of such fees is to be made only in accordance with applicable agreements, only to the extent that other normal current operating expenses are paid, and only if the non-payment of real property tax or utility arrearages does not present an imminent danger to the continued operation of the Property. For any Property where by prior agreement normal current operating expenses are subordinated to debt service payments to a class member, such subordination agreements continue in effect.

The Settlement expressly adopts the definition of cash collateral contained in 11 U.S.C. § 363 and requires Court approval for payments from such cash collateral other than as set forth above.

The Settlement requires each management company to maintain a separate, segregated bank account for each Partnership without commingling of such funds. Funds needed to make payments properly provided for in the Settlement, however, may be transferred to a management company's disbursement account for the sole purpose of effectuating payment to the appropriate payee. In the event any management company files bankruptcy, cash belonging to a specific Partnership shall not be property of the management company's bankruptcy estate pursuant to 11 U.S.C. § 541.

The Settlement also requires provision of a monthly accounting to each class member for each Partnership to which the class member has made a mortgage loan, unless the Partnership's Property is under the control of a receiver.

Upon at least ten (10) days' notice to the Debtors, each class member is given the right to seek relief in this Court from the injunction. Such relief is to be premised upon the legal and factual standards applicable in a motion for relief from the automatic stay under § 362(d) of the Bankruptcy Code. If the injunction is modified or vacated with respect to Property of a Partnership, and that Partnership subsequently files a separate Chapter 11 petition, neither the Debtors nor their subsidiary manage-

ment companies may oppose similar modification or vacation of the automatic stay imposed under § 362(a) in that particular Partnership's case. Any class member or the Debtors may also seek a hearing before this Court on ten (10) days' notice to request relief for asserted non-compliance with the Settlement.

By the terms of the Settlement, upon timely request by the Debtors, the Court may grant an extension of the injunction against individually identified members of the class for a period of up to sixty (60) days. Such extensions will require a showing by the Debtors of significant progress toward developing an effective plan of reorganization, necessity of the extension to facilitate the development of such plan, and a lack of impairment to the value of the class member's collateral by the extension. Class members may also negotiate and reach a separate agreement with the Debtors regarding any Partnership Property to which the class member is a lender.

Finally, the Settlement provides that this Court will retain jurisdiction over all matters relating to the administration, consummation and enforcement of its terms.

## III. STANDARDS FOR APPROVAL OF A CLASS ACTION SETTLEMENT

 Case law in this and other circuits requires that proponents of a settlement in a class action demonstrate to the Court that the compromise agreement is adequate, fair and reasonable. *Stotts v. Memphis Fire Dept.,* 679 F.2d 541 (6th Cir. 1982), *rev'd on other grounds,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974). Where the order proposed to be entered approving the settlement calls for injunctive relief and the Court must continue its jurisdiction to uphold, enforce or modify the terms of that order, the order is in the nature of a consent decree. As such, it has "attributes both of a contract and of a judicial act." *Stotts,* 679 F.2d at 556. And as such, it also must be consistent with the public interest and with the objectives of the stat-

ute it seeks to enforce. *Williams v. Vukovich,* 720 F.2d 909, 923 (6th Cir.1983).

 Where a settlement not only compromises a class action suit, but also compromises an action belonging to a bankruptcy estate, the Bankruptcy Court must become familiar with the facts underlying the action and must make an independent judgment of the fairness and equity of the compromise. *Reynolds v. Comm. of Internal Revenue,* 861 F.2d 469, 473 (6th Cir. 1988).

Case law has delineated various appropriate factors a Court should consider in determining the reasonableness, fairness and adequacy of a compromise in a class action suit. *See In re Baldwin–United Corp.,* 607 F.Supp. 1312 (S.D.N.Y.1985). Those factors include:

(1) the complexity, expense and likely duration of the litigation,

(2) the reaction of the class to the settlement,

(3) the stage of the proceedings and the amount of discovery completed,

(4) the risks of establishing liability,

(5) the risks of establishing damages,

(6) the risks of maintaining the class action through the trial,

(7) the ability of the defendants to withstand a greater judgment,

(8) the range of reasonableness of the settlement fund in light of the best possible recovery,

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell,* 495 F.2d at 463 (citations omitted).

Some of the factors set out by the *Grinnell* court, such as the financial resources of the defendants and the ability of the defendants to withstand a greater judgment, may be more relevant in a plaintiff class action. Moreover, evaluation of the risks of maintaining the action as a class action through trial is pertinent only where settlement precedes certification of the class. Where the relief sought is an injunction against a defendant class, discussions

of damages and the settlement fund also are less relevant. And while the reaction of the class is an appropriate consideration in either a plaintiff or a defendant class action, such reaction would be expected to be negative more frequently in a defendant class action.

Necessary components of the Court's analysis in this defendant class action are the complexity, cost and likely duration of the litigation, the stage of the proceedings at which the compromise occurred, the amount of discovery completed, the substance of objections raised by class members, risks inherent in the litigation, and the appropriateness of the settlement terms in light of the best results possible for either side if the litigation continued.

The Court notes that it appears easier to state the relevant factors to be examined and the issues to be determined than to apply those stated concerns in a consistent manner. In much of the case law, the concerns subject to analysis overlap. That is, it is not always clear which considerations relate to fairness, or to adequacy, or to reasonableness; rather, the same considerations appear under each factor. In this proceeding, however, although some overlap may be unavoidable, the Court believes distinctions are both appropriate and possible.

## A. *Fairness*

An examination of fairness in the context of the settlement now before this Court requires scrutiny of the negotiation process; a comparison of the effect of the final agreement upon the Settling Defendants, the Non–Settling Defendants and the absent class members; and the impact of the decree upon the interests of all those not consenting to it.

Compromise of this action was reached in the early stages of the litigation before any hearing on class certification. As the settlement also acts as a compromise of the certification issue, the Court must consider its impact upon absent class members, named defendants not joining in the settlement and other intervening parties. That process requires heightened scrutiny of the settlement negotiation process to deter-

mine if there is evidence of collusion and examination of the result to determine if the proposed decree imposes a disparate effect on the interests of the Settling Defendants as opposed to its effect on the interests of the Non–Settling Defendants and absent class members.

### 1. *The Settlement Process*

The record indicates that discussions between counsel for the named parties regarding possible resolution of this adversary proceeding began as early as June 1, 1989. Apparently, all of the parties understood that if an agreement was to be reached, it would have to be accomplished on an expedited basis. Therefore, immediately after that date, a series of meetings occurred at various times and places with counsel for the named parties. It is clear from testimony and affidavits submitted by representatives of the Settling Defendants that counsel for the named parties were in regular contact with their respective clients.

As of June 5, 1989, negotiations continued between the Debtors and five of the seven named defendants. Those named defendants were Buckeye Federal, Crown, CrossLand, Florida Federal and Comerica. On June 6 Comerica chose to terminate its participation in the negotiations because counsel believed one aspect of the settlement, which was not acceptable to his client, was not resolvable. The four remaining named defendants continued to negotiate with the Debtors through June 6 and 7. On June 8, 1989, counsel for the Debtors executed the Settlement with counsel for the remaining four named defendants; Buckeye Federal, Crown, CrossLand and Florida Federal.

The Court finds no evidence of any impropriety or collusion in the settlement process itself. Although such collusion was alleged in the Mandamus Petition which disrupted the earlier scheduling of a hearing to consider this settlement, the Court is convinced that such allegations were unsupported and inappropriate and were a highly questionable litigation ploy. *See Midland Mutual Life Insurance Co. v.*

*Sellers,* 101 B.R. 921 (Bankr.S.D.Ohio 1989). Indeed, such tactics, as related specifically to charges of collusion or unethical behavior generally, raise legitimate concerns about the professionalism of counsel for the petitioner in the mandamus action. Those tactics also resulted in serious consequences for putative class members not parties to that action.

The evidence further establishes that intensive arms-length discussions occurred between the Debtors and at least six of the seven named defendants. Terms were negotiated and several provisions were strongly contested. That some of the named defendants did not agree to the Settlement further reinforces that perception. Thus, the Settlement which resulted was not tinged with collusion.

### 2. *The Comparative Effect*

As might be expected in a defendant class action, counsel for the Settling Defendants maintain that the interests they pursued and represented were only those related to their clients' interests. Such strong and vigorous representation of one's own client, as a practical matter, is a major component of the adequacy of a named representative in a defendant class action. *See Doss v. Long,* 93 F.R.D. 112 (N.D.Ga. 1981). That adequacy of representation within the scope of the requirement of Fed. R.Civ.P. 23(a)(4) assumes, however, that by vigorously raising their own defenses, the Settling Defendants necessarily raised all defenses common to the class, including those of absent members. *Doss,* 93 F.R.D. at 118. The Court then must examine the fairness of the compromise to see if its effects somehow are different for the Settling Defendants than for others impacted by the proposed decree, but not consenting to its entry.

The Non–Settling Defendants and various objecting parties addressed the concern relating to disparate effect primarily in the proposed decree's bar against further appointment of receivers or invocation of other rent protections, such as perfection of rent assignments or rent sequestrations. As the Debtors' abilities to properly control, account for and manage funds are contested, the right to obtain receivers or otherwise control the rents is valued by many putative class members.

At the time of the hearing, receivers had been appointed to manage or collect rents for approximately 55 of the Properties. It is not clear how many sequestrations or assignments of rents had been invoked. Many of the objecting parties appearing at the hearing did not have such protections in place. The Settling Defendants account for 24 of those 55 receivers. The Non–Settling Defendants and the remaining putative defendant class members, comprised of approximately 266 members, account for the remaining 27 receivers. Evidence further established that of the 58 Properties against which the Settling Defendants had mortgages, 24 had receivers, 21 had consensual arrangements for direct payment of rents into a court-supervised escrow account, 10 were not in default on June 8, 1989 when the compromise agreement was executed, and 3 had only technical defaults or payments less than 30 days delinquent.

Because the proposed decree enjoins the appointment of receivers or other rent protection devices after June 8, 1989, but leaves in place receivers or individualized agreements regarding cash flow obtained prior to that date, the Non–Settling Defendants and objecting putative class members assert that the Settling Defendants are impacted in a manner significantly less onerous than are other members of the class generally. The Court agrees with this contention. At least with regard to receivers and other forms of rent protections in place or not considered essential at the time the Settlement was entered into, the effect of the Settlement is disparate between the Settling Defendants, on the one hand, and the Non–Settling Defendants and other putative class members on the other. That finding is not altered by the fact that most of the mortgages held by the Settling Defendants which were not in default on June 8, 1989 are now in default. The relevant comparison is made as of the time the Settlement was executed.

3. *The Impact Upon Non–Settling Parties and Putative Class Members*

The Debtors assert that one of them or a subsidiary or affiliate is a general partner in 900–1000 Partnerships, each of which owns an apartment, motel, or retirement housing property. There also are 29 properties under construction. Each of the completed Properties has a first mortgage held by one of the approximately 270 members sought to be included in this class. The Debtors further admit that all but 80 of those Partnerships are in default of payments on their respective first mortgage obligations. Most, if not all, of the Properties for which mortgages are not in default belong to syndicated Partnerships.

As of July 27, 1989, the Debtors represented that there were 180 foreclosure actions pending against the Properties. There are 64 scheduled foreclosure sales, 33 of which are in non-judicial foreclosure states. Many of the mortgages are non-recourse, but a substantial number either are with recourse to the general partner or are guaranteed by CII or CII's principal shareholder and president. Not included in that total are 23 foreclosure actions pending against properties of partnerships which have already filed Chapter 11 cases with this Court.

The Settling Defendants have initiated approximately 45 of the pending foreclosure actions. The Non–Settling Defendants initiated another 36 such actions. Accordingly, the seven (7) Defendants named as class representatives are responsible for 82 of the approximately 180 pending foreclosure actions. The other 100 or so are spread among the 263 non-named putative class members. Apparently, active litigation increased a mortgagee's chances of being named as a defendant class representative.

By this action, if it prevails on the merits or obtains the Court's approval of the Settlement, CII hopes to avoid filing additional Chapter 11 cases for any of the Partnerships or for subsidiaries not currently under the jurisdiction of this Court. The proposed injunction barring actions against the Properties would permit the Debtors, through their subsidiary management companies, to collect rents from properties where receivers or other agreements were not in place before June 8, 1989. Within certain guidelines the Partnerships also could pay current operating expenses, including management and other service fees to other Cardinal companies during that work-out period. Remaining net cash would be paid to the first mortgage holders which are putative members of the class up to any current or past-due amounts owed to the mortgagee.

The problem with those provisions, as expressed by objecting parties, is that their impact varies greatly depending upon the Property involved and the terms of the lender's contract with the Partnership. Some of the notes have recourse to the general partner or an insider of the Debtors and others do not. Some of the Properties have value in the marketplace by virtue of current or potential cash flow in excess of amounts needed to service the mortgage and others do not. Other variables related to value are occupancy rates, location, total rents generated and maturity of the Property. It is also clear that the potential for such value may differ between an apartment complex, a retirement village, or a motel which is part of a chain. Therefore, the provisions of the proposed order are fair to some of the putative class members but not fair, in the sense of even-handedness of impact, with regard to all.

Other objectors to the Settlement include syndicated Partnerships and limited partners in Partnerships where mortgage payments are current or where all net cash flow over the 120–day period will not be needed to service the mortgage debt. Those limited partners, and the Partnerships on their behalf, assert rights under the various partnership agreements to receive a designated share of such profits. While details of such arrangements were not brought to the Court's attention, those parties are not affected by the proposed decree in the same manner as other parties and their interests do not appear to have been taken into account in the negotiating process. Although such interests could be

handled in the process by which relief from the injunction can be obtained, the issue raised with these parties and by many of the putative class members is the fairness of placing the burden for relief upon the party to whom the Settlement is unfair.

In sum, although the negotiating process was fair and non-collusive, the terms of the Settlement unfairly favor the Settling Defendants when the effect of its terms upon them is compared with the effect of those terms upon other parties and many of the putative class members. Therefore, the settlement is unfair to the extent it lacks comparative equality in effect and impact upon all parties which would be affected by its entry.

## B. *Reasonableness*

There are several components of reasonableness which the Court must examine in determining whether to approve the settlement of this class action compromise in bankruptcy. Essentially, the Court must assess the relative benefits and disadvantages the Settlement provides for the Debtors and for the Settling Defendants, as named representatives of a class, and must compare that assessment with the probable success of each side had the action proceeded to trial. The Court must not actually try the merits of the case or otherwise decide contested factual issues relevant only to the merits. *In re Art Materials Antitrust Litigation*, 100 F.R.D. 367, 370 (N.D.Ohio 1983).

Factored into that analysis is an evaluation of the stage at which the settlement occurred, the extent of discovery available to the settling parties and the probable time and expense saved by compromise. *Plummer v. Chemical Bank*, 91 F.R.D. 434, 438 (S.D.N.Y.1981), *aff'd* 668 F.2d 654 (2d Cir.1982). Deference is generally given to the opinions of experienced counsel, although in a defendant class action settled prior to certification of the class and, therefore, prior to any determination of the adequacy of the representatives, such deference may be less appropriate. *See Williams*, 720 F.2d at 922–923. The possibility of maintaining the action as a class action through trial is also a factor.

## 1. *Stage of the Proceeding and Extent of Discovery*

The Settlement in this matter came approximately two weeks after the initial complaint was filed. Because the complaint requested injunctive relief and was scheduled to be tried prior to the expiration of temporary restraining orders entered by this Court, that abbreviated period is not unreasonable when compared to the anticipated length of the litigation.

The Settlement also occurred prior to any discovery period. Indeed, one of the stated goals of the Settling Defendants was to avoid the expense of what was perceived to be complex litigation with these Debtors in the initial phases of a large Chapter 11 case when it was felt that debtors generally receive temporary protection to assess their positions and attempt to reorganize. Because of certain protections the Settling Defendants had for rents from the Properties against which their mortgages operated, the absence of substantial default in payments from their other Properties and the limited period of relief sought by the Debtors, the Court believes the Settling Defendants made a justified business decision that continuing the litigation, even if they prevailed, might be more expensive than agreeing to the terms of the injunction. That decision necessitated only minimal need for discovery and reduced the need for extensive evaluation on the merits other than what was available to the Settling Defendants from their own records.

The proposed decree will not affect all putative class members in the same manner, however. Depending upon the revenue-generating potential of a particular Property, the extent of unpaid real estate taxes, the maturity of the project, the relative size of the lender's mortgage portfolio to its financial institution's net worth or commercial loan portfolio, requirements of the particular regulatory body to which the lending institution reports and the Debtors' ability to handle the rents appropriately, the effects of the proposed order have differing costs. Therefore, the absence of discovery, while not harmful to the Settling

Defendants, may have harmed putative class members for whom the relative costs occasioned by the proposed injunction are greater. Essentially the lack of discovery may have precluded a meaningful evaluation of comparative costs on their behalf.

2. *Comparison of the Settlement Terms and the Probable Result of Litigation*

More important than the absence of discovery on the merits, however, is a comparison of the provisions of the Settlement with the relief requested in the amended complaint. The Debtors' amended complaint seeks a determination that 11 U.S.C. § 362(a)(2) and (3) apply to stay actions by mortgagees and others with security interests in Partnership Properties. If § 362(a)(2) and (3) do not apply, the complaint asserts that such actions should be stayed pursuant to 11 U.S.C. § 105(a) for a period of sixty (60) days with retention of the Debtors' right to request an extension, if needed. In return, the Debtors offered to "pass through" all net cash to each lender against the Property from which the rents were received.

As primary support for the relief sought the Debtors asserted that various interests of the Debtors in the Partnership Properties were of such a nature that attempts by lenders to exercise control over the Properties would be acts to obtain property from the Debtors' estates within the meaning of 11 U.S.C. § 362(a)(3). The Debtors further asserted that such attempts would make it impossible for them to reorganize. The Debtors also maintain that those interests in the Partnership Properties are their most significant assets.

The interests sought to be protected were identified by the Debtors and by a representative of Kenneth Leventhal & Company ("Leventhal"), an accounting firm retained by the Debtors to assist in the restructure of the Debtors' obligations. Those interests consist primarily of various receivables from the Partnerships, including: (1) monies advanced to the Partnerships by the Debtors or their subsidiaries for which second mortgage notes were received; (2) advancements to the Partner-

ships and included as mortgage differentials in wraparound mortgage notes, representing funds advanced for projects above what was advanced by the first mortgage lenders; (3) unsecured claims against the Partnerships for operating advances; (4) unsecured construction loans for projects currently in progress; (5) options, executed the same day as the Debtors' bankruptcy filings, granting CII the right to purchase each of the Properties of the non-syndicated Partnerships; (6) contracts with the Partnerships to manage the Properties; and (7) various general partner interests in profits and losses or control.

The face amounts of those interests in the first four categories, without discount to present value, were estimated at approximately $300,000,000. No particular values were assigned to the purchase options, and the general and limited partner interests were estimated as having a value of tens of millions of dollars over the next ten-year period. The Debtors wish to preserve those values, of which the largest composite amount is the $169,000,000 face value ascribed to the second mortgage receivables, by restructuring 80–90% of the Partnerships' first mortgage obligations and retaining and exercising general partner and management rights over a period of ten (10) years.

In making the value analysis Leventhal did not distinguish whether any particular assets were owned by the Debtors or by another of the Cardinal Companies. Testimony established and it appears uncontroverted, however, that most of the direct ownership of the assets is in subsidiaries of the Debtors. An examination of the second mortgages demonstrates this fact. Of the $169 million in second mortgage receivables, less than 10% of these receivables are owed directly to CII or CIF. Instead, the overwhelming majority of second mortgage notes are held by non-debtor subsidiaries of CII or CIF. Further, the only general partners of some of the Partnerships are subsidiaries other than the Debtors.

Vigorous statements were advanced to the Court contesting the application of

§ 362(a)(3) to protect the Debtors' interests in the Partnership Properties and to challenge the appropriateness of any use of 11 U.S.C. § 105(a) to accomplish that which otherwise could not be accomplished under the Bankruptcy Code. Those objections include challenges to the designation of any attainable value in the interests, characterization of the interests as property of these Debtors' estates, the ability of foreclosures to affect certain interests, and any assertion that many of the interests are legal interests in the Properties rather than equity interests in the Partnerships or general unsecured claims against the Partnerships.

The objections indicate to the Court that the Debtors' chances to prevail on the merits of this action are far from certain. The relief sought appears to involve an extension of existing law and requires this Court to adopt some aspects of the enterprise theory of corporate law. That assessment means that the range of reasonableness by which this settlement must be judged should include concessions in the Debtors' position. Despite the Debtors' assertions on that point, however, significant concessions are not obvious to the Court.

The stay of actions imposed by the proposed decree is based upon this Court's powers under 11 U.S.C. § 105(a) and is for the full sixty days requested in the amended complaint plus an additional period of equal length, with possible further 60-day extensions against class members on an individual basis only. The Debtors claim to have made a concession on this point because the Settlement provides that a class member may apply to the Court for relief from the injunction under the standards set forth in 11 U.S.C. § 362(d). The Settlement, however, does not make any reference to 11 U.S.C. § 362(e). The absence of such a reference to § 362(e) is noteworthy because had the Debtors prevailed after trial on the merits and § 362(a)(3) had been found to apply to their interests in the Partnership Properties, the ability to request relief would have been available to class members under the expedited basis set forth in 11 U.S.C. § 362(e). It is correct, that had the Debtors prevailed at trial on the § 362(a)(3) issue, the duration of the

resulting stay would not have been limited. However, a class member could have obtained relief pursuant to § 362(d) and (e). Further, while any injunction imposed under § 105(a) would have been limited in duration, because such injunction would be based upon an extension of § 362(a), the right to relief under § 362(d) and (e) would be implicit.

Further, although receivers or other rent protections obtained prior to June 9, 1989 were kept in place by the Settlement, the complaint did not request the release of previously obtained protections. The Court presumes such relief would have been pursued had the application of § 362(a)(3) been found to be appropriate. No retroactive effect would have occurred if § 105(a) had formed the basis for the relief, however.

There was testimony that the Debtors compromised by agreeing to permit certain past-due obligations of an emergency nature to be paid prior to payment of management fees to other Cardinal Companies. However, cross-examination brought out that such emergency expenditures had traditionally been made first. Accordingly, any asserted compromise in that area appears illusory.

A representative of the Debtors testified that membership in the class affected by the proposed injunction was less inclusive than that sought by the Debtors. The Settlement class included only persons and entities with a mortgage interest or an outstanding letter of credit respecting a mortgage interest against Partnership Properties. Although the original complaint sought to enjoin all creditors of the Partnerships, the class sought by the amended complaint encompassed only those persons and entities with a mortgage or other security interest in Partnership Properties. The assertion was that the group defined by the amended complaint included mechanics lienors and perhaps judgment lienors. Such an interpretation, however, would require that the term "security interest" be used in a sense which is different from the consensual basis for such interest as defined in the Bankruptcy Code. *See* 11 U.S.C. § 101(45). What class

members would be included by the relief sought in the amended complaint which would be excluded by the compromise is, therefore, unclear.

The Debtors further maintain that concessions were made in the Settlement with regard to management of cash generated from the Properties. Specifically, the proposed order requires that the Debtors and their subsidiary management companies may use cash collateral, as defined by 11 U.S.C. § 363, only for the agreed purposes set forth in the order or as expressly authorized by the Court. Such provisions cannot appropriately be termed concessions, however. Were the Debtors to prevail at trial and actions by these mortgage holders against the Partnership Properties were stayed by § 362(a)(3), the rent assignment provisions found in most of the mortgage documents would mandate application of the more stringent provisions of 11 U.S.C. § 363. And it hardly could be argued that a stay issued pursuant to 11 U.S.C. § 105(a) could give lenders fewer rights than they would possess if relief were premised upon § 362(a)(3) of the Bankruptcy Code. On balance, the Court believes that inclusion of some § 363 limitations in the proposed order was not a concession on the merits.

Likewise, the Court finds no concession by the Debtors in the Settlement provision which declares that Partnership funds generated from rents collected by the subsidiary management companies shall not belong to those management companies' estates if such companies file bankruptcy while those funds are in a collective disbursement account. Ownership of those funds is not contested as between the management companies and the Partnerships.

The final provision asserted by the Debtors as a concession is the agreement that if a class member successfully obtains relief from the proposed injunction, notwithstanding the Partnership's subsequent right to file its own Chapter 11 case and, thereby, impose a new stay of actions against that lender, neither the Debtors nor any of the related subsidiary management companies would oppose relief from the automatic stay imposed by the Partnership filing. What is unclear, however, is whether the Partnership itself could oppose such relief through another general partner or otherwise. As a matter of practicality, if this Court found relief from the injunction to be appropriate based upon the standards in 11 U.S.C. § 362(d), unless circumstances were very unusual, such factual findings should preclude effective opposition to a motion for relief from stay in a subsequent Partnership case. Accordingly, that concession may reflect a practical reality. It was clear, however, that no assurances could be given that the language in the proposed order operated to bar the Partnership from asserting a defense or otherwise delaying the relief previously obtained by the class member. As the Partnerships were not parties to the Settlement it is unlikely that such representations could have been made.

Except for a finite limitation on the duration of any relief which could be obtained solely under 11 U.S.C. § 362(a)(3), the relief granted to the Debtors consists of practically all of what was requested in the amended complaint. While that result may be appropriate and reasonable for the Settling Defendants, given the various defenses and lack of protections asserted by objecting parties, such result does not appear to represent a reasonable resolution of the merits when the balance of risks in this litigation is considered.

3. *Likelihood of Maintenance of Class Action*

The final element relating to reasonableness involves an assessment by the Court of the possibility that this action could be maintained as a class action through trial. As might be expected in a defendant class action, that issue is vigorously contested.

Arguments on the class action issue have varied depending upon whether the certification is sought for the issue of the application of § 362(a)(3) or the extension of § 362(a) by the imposition of an injunction under § 105. Essentially, the objectors argue that even though the application of 11

U.S.C. § 362(a) to the Debtors' interests in the Partnerships and the Properties may potentially be a certifiable issue, such issue is frivolous and should not be used as the basis for certification of a defendant class. With regard to the issue of the use of the Court's injunctive powers under 11 U.S.C. § 105(a), the objectors maintain that satisfaction of balance of harm tests required for the issuance of an injunction under § 105 makes it highly unlikely that a defendant class could be certified for that purpose when the class would be composed of members with factual variations in the status of their Properties and property interests determinable only under the laws of 20 different states. Other challenges were raised primarily with regard to typicality, the adequacy of representation and the satisfaction of subsection (b)(1)(B) of Fed.R. Civ.P. 23. The presence of these arguments means that it is uncertain whether this action would be maintained through trial as a class action.

In sum, it appears that the relief granted to Cardinal in the compromise includes most of the relief sought by the amended complaint. Most concessions are illusory. That balance of rights may have been satisfactory to the Settling Defendants because of protections they had in the area of rent protections, the acceptability of their remaining projects, or because the compromise eliminated substantial legal expenses anticipated as a class representative. The resulting decree is not, however, within the reasonable range for a settlement as to the class as a whole and the likelihood of maintaining this action as a class action through trial is uncertain. Therefore, the Settlement does not fall within the range of reasonableness required to be shown to obtain the approval of the Court.

### C. *Adequacy*

An evaluation of the adequacy of the Settlement requires the Court to examine the degree to which the decree allays fears with respect to the Debtors' handling of cash, the clarity of the terms of the decree, and the ability of the Court to handle the individualized relief provided for by the order.

### 1. *Accounting Concerns*

Much of the evidence adduced at the settlement hearing related to problems perceived by the Non–Settling Defendants or putative class members relating to the Debtors' ability to handle and account for cash. Much of that concern comes from previous actions of CII.

The Cardinal Companies experienced considerable growth in the number of motel projects commenced within the last two years. That growth in motel construction, coupled with dislocations in the budget motel business, the decline in the attractiveness of new apartment projects resulting from changes in the Internal Revenue Code affecting benefits to investors in real property limited partnerships, and other factors not as easily quantified, caused severe cash flow problems to the Cardinal Companies and the Partnerships. Instead of filing Chapter 11 cases in February 1989, when cash flow problems became severe, CII, as managing general partner of most of the Partnerships and the parent of CIF, directed all non-syndicated Partnerships to send their available cash to CII rather than make their full or partial mortgage payments for that month. CII asserts that it was owed substantial sums from those Partnerships and that it was entitled to those monies for its own uses. Whether that action, taken against the advice of Leventhal, was proper or not, it certainly caused the Debtors enormous losses in credibility with lenders relying on those rents to service their respective mortgages. Most of those mortgage obligations have been in default since that corporate decision in February.

It also appears that the Debtors' accounting and bookkeeping processes were and are less than perfect. So long as the monthly cash flow from the Partnerships was sufficient to pay the monthly mortgage payments to lenders, the fees to the Cardinal Companies and other expenses, few lenders noticed or cared. But once the mortgage payments fell into default, microscopic examination of the accounting process began in earnest.

The evidence indicates that significant concerns about the handling of cash still remain, despite the institution of separate accounts for each of the Partnerships, increased controls and a stated intention to "pass-through" net proceeds. Monies have been paid out of the Partnerships in error as management fees to subsidiaries of the Debtors in apparent excess of the percentages authorized by the governing contracts. Disputes exist about amounts due from the Partnerships under the various mortgage notes and incorrect amounts have been received by putative class members. Cash also was taken in error from certain syndicated partnerships on or about May 12, 1989, and Partnership funds which were commingled in a single disbursement account of the Debtors were executed upon by creditors of the Debtors. Further, accounting for receipts and identification of payables may be less than satisfactory in many cases.

The proposed decree gives considerable latitude to the Debtors and certain of their subsidiaries not in bankruptcy to designate and pay normal current operating expenses of the Partnership Properties. Lenders are uneasy about losing control over those functions because of the prohibition against seeking appointment of receivers and the demonstrated current unreliability of the accounting processes.

2. *Clarity of Terms*

The objectors also point to several ambiguities in the language of the proposed decree which cause concern. Putative class members further object to the absence of adequate protection where a mortgage against a Partnership Property is greater than the value of the Property, especially where rents are insufficient to service the debt or, as in some instances, insufficient even to pay current operating expenses. Many of the Properties also have unpaid real property taxes. Although the Debtors have agreed to provide monthly accountings to the lenders, those reporting requirements are less than what would be imposed on the Partnerships if they were in Chapter 11. In fact, in a nutshell, the lenders feel they are being asked to shoulder the burdens of Chapter 11 filings for the Partnerships without the protections or benefits provided by the Bankruptcy Code, while the Partnerships receive benefits and protections of that law without any of its associated burdens. While some of the concerns may be overstated, in several instances the Court believes the perceptions are accurate.

It is also unclear what standard would be used when a class member seeks relief from the proposed injunction. Although the proposed order indicates that 11 U.S.C. § 362(d) would apply, it is not clear whether it is the Debtors or the Partnerships against which the relevance of lack of equity or essentialness of the Properties for effective reorganization would be tested. It is undisputed that a Partnership could receive protection from the injunction and then file its own Chapter 11 case and invoke an additional stay. The potential for a lengthy delay is significant.

For purposes of implementing the proposed decree, certain non-debtor subsidiaries of CII executed consents to the jurisdiction of this Court. Questions about the authority of the party executing those consents have been raised.

3. *Resources of the Court*

The Court also has considered the impact upon its resources of the individualized relief provided for in the decree. In reality, whether numerous Partnership cases are filed or numerous individualized requests for relief are made, the impact upon this Court's staff and upon other cases requiring the Court's attention will be considerable. Certainly no ruling would be based upon that factor alone. But the Court is not convinced that the individualized relief provided for in the proposed injunction is less burdensome than the separate Chapter 11 cases would be. Accordingly, this consideration is of little weight.

In sum, even if all ambiguities in the proposed order were resolved in favor of the class members, it is not clear that the provisions of the decree are adequate to protect funds which would clearly be cash

collateral if the Partnerships or subsidiaries were Chapter 11 debtors before this Court. Although debtors often have accounting problems in the initial phases of a reorganization case and such deficiencies can be corrected, without the supervision of the Court and the United States Trustee and the willingness to be subject to the Court's jurisdiction for all purposes, the Court cannot find that the decree is adequate to protect the cash or deterioration in value concerns of all putative class members not consenting to the settlement.

### D. *Public Interest or Policy Concerns*

Finally, and perhaps most importantly, because the proposed order requires continued jurisdiction by this Court for enforcement and modification, it must be consistent with public interest and with the spirit and provisions of the Bankruptcy Code. *Williams*, 720 F.2d at 923. In various respects the Court believes the proposed order does not meet that standard.

The Bankruptcy Reform Act of 1978 was the product of much study and a lengthy process of accommodation in the Congress. One basic principle which runs throughout its provisions, however, is that, the protection it provides is available only for the specific entity which is the debtor. *See In re Korangy*, 1989 WL 34317, 1989 Bankr. LEXIS 500 (Bankr.D.Md. 3/30/89). Specific instances where the protection is extended are set forth in unambiguous statutory language. *See, e.g.* 11 U.S.C. § 1201 and § 1301; *Lynch v. Johns–Mansville Corp.*, 710 F.2d 1194, 1197–1198 (6th Cir.1983). Perhaps it can be argued that contemporary business organization in this country calls for adoption of the enterprise theory in a manner far beyond that previously embraced by the Courts. *See* P. Blumberg, *The Law of Corporate Groups: Bankruptcy Law*, 515–527 (1985). This Court, however, is not the appropriate forum for such arguments.

In some respects the position of a debtor in a Chapter 11 reorganization can be analogized to that of a supplicant in the confessional. The debtor which seeks the protection of the Bankruptcy Court must fully reveal its financial status and all its actions, both before and after its bankruptcy filing. In return for such candor and genuine desire to revitalize the business and repay its creditors, each creditor must forebear for a reasonable period from exercising its contractual remedies so that all parties may survey the situation with complete knowledge, salvage what can be salvaged and discard what is no longer needed. All parties also must observe the statutory distribution system which is such a vital part of the Bankruptcy Code.

The Court believes these debtors want only the second part of that process. They ask for cooperation and forebearance, either on a voluntary basis or by an injunction issued by this Court. But they decline to bare their financial souls and wish to keep their operating and other subsidiaries and the Partnerships away from the process entirely, even though the interests for which they seek protection may be property primarily of the bankruptcy estates only of those non-debtor entities. Certain testimony elicited on cross-examination exposed risks which may result from complete candor and submission to the bankruptcy process. However, despite a superficial appeal to its docket, this Court could not and would not sanction an approach which would alter the basic relative rights and duties imposed on each entity seeking the protection of the Bankruptcy Court under the provisions of the Bankruptcy Code.

Accordingly, the Court finds that to the extent the relief contemplated by the proposed order requires this Court to protect the interests of non-filing subsidiaries of these Debtors in Properties owned by other legal entities also not in bankruptcy, such relief goes beyond the intent or spirit of the Bankruptcy Code and could not properly be part of any injunctive decree issued as part of this Settlement.

### IV. CONCLUSION

Based upon the foregoing, the Joint Motion for Approval of Settlement of Class Action must be, and the same is, hereby denied. Consistent with Judge Kinneary's request, the Debtors' motions for class certification and for preliminary injunctive re-

lief are hereby scheduled for hearing beginning at 9:30 a.m. on Thursday, August 24, 1989 in Courtroom 148, U.S. Bankruptcy Court, 85 Marconi Boulevard, Columbus, Ohio. Any change in that schedule will be announced on the Bankruptcy Court Cardinal line (614) 469–6814 beginning August 23, 1989 at 9:00 a.m. The Court does not require or request further memoranda of law on those issues as such pleadings were received in response to a prior deadline earlier in this proceeding.

IT IS SO ORDERED.