**In re CARDINAL INDUSTRIES, INC.**

**In Joint Administration With**

**Cardinal Industries of Florida, Inc., Debtors.**

**Bankruptcy Nos. 2–89–02779, 31–4427382 and 58–1419022.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Jan. 4, 1990.

David G. Heiman, Jones, Day, Reavis & Pogue, Columbus, Ohio, for debtors.

John R. Climaco, Climaco, Climaco, Seminatore, Lefkowitz & Kaplan, Cleveland, Ohio.

Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, Stuart Hirshfield, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Official Unsecured Committee of Creditors for Cardinal Industries, Inc.

Charles M. Caldwell, Columbus, Ohio, Office of the U.S. Trustee.

Joel B. Piassick, Smith, Gambrell & Russell, Atlanta, Ga.

Louis Ebert, Gebhardt & Smith, Baltimore, Md.

## OPINION AND ORDER ON MOTIONS FOR THE APPOINTMENT OF A TRUSTEE

BARBARA J. SELLERS, Bankruptcy Judge.

These matters are before the Court upon Motions to Appoint a Trustee in the Chapter 11 cases of Cardinal Industries, Inc. ("CII") and Cardinal Industries of Florida, Inc. ("CIF") (collectively "Debtors"). The motions were filed on behalf of the Official Unsecured Creditors' Committees of CII and CIF, were opposed by the Debtors and were tried to the Court. The United States Trustee appeared in support of the relief requested by the motions and Equitable Bank, a creditor of CII, intervened as an additional movant in the CII case.

The Court has jurisdiction in this matter under 28 U.S.C. § 1334 and the General Order of Reference previously entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) which this Bankruptcy Judge may hear and determine.

Extensive background of these Debtors' operations and of previous events in these cases was set forth in earlier opinions of this Court. *See Cardinal Industries, Inc. v. Buckeye Federal Savings & Loan Association (In re Cardinal Industries, Inc.),* 102 B.R. 991; 105 B.R. 834 (Bankr.S.D. Ohio 1989) ("Buckeye Adversary"). The Buckeye Adversary focused on the Debtors' relationships with secured lenders to approximately 1,000 limited partnerships for which these Debtors are managing general partners.

Certain problems have now arisen between the Debtors and the unsecured creditors of CII and CIF. Those problems culminated in the filing of these motions on November 15, 1989. Because CIF is a wholly owned subsidiary of CII and the senior management of the two entities overlap, the motions are being considered together.

The Official Committee of Unsecured Creditors of Cardinal Industries, Inc., the Official Committee of Unsecured Creditors of Cardinal Industries of Florida, Inc., and Equitable Bank (collectively "Creditors") allege that cause exists for the appointment of a trustee because management of the Debtors is incompetent and has grossly mismanaged the affairs of the Debtors. In the alternative the Creditors seek to establish that the appointment of an independent trustee would be in the interest of all constituencies and would be cost effective.

## I. FACTUAL ASSERTIONS AND FINDINGS

In support of their motions the Creditors focus on three areas of concern: certain business judgments exercised by management after passage of the Tax Reform Act of 1986, specific pre-petition actions in 1989 and perceived inadequacies in post-petition operations. While dishonesty or outright fraud was not alleged, the Creditors assert that the facts established prove that these Debtors, as presently managed, are unable to direct their affairs and reorganize under Chapter 11 of the Bankruptcy Code.

758

## A. *Business Judgments Between 1986 and 1989*

CII was organized in 1954. Since that time it developed two significant independent businesses. First, it became a major manufacturer of modular housing which is used in various configurations as apartments, motels, retirement villages, single family homes, student housing, day care centers, offices and other shelter products. Its other business was real estate development and syndication of partnership interests in its developed properties, by which it created a captive market for its manufacturing enterprise. CII and its wholly owned subsidiaries (collectively "Cardinal"), of which only CIF was in Chapter 11 at the time these motions were tried, constitute a vertically integrated operation that plans, manufactures, constructs, and ultimately manages and services real estate projects. Through those operations Cardinal developed more than one thousand real estate projects in twenty states and manages approximately 50,000 apartment units, 200 motels, sixteen retirement villages and other miscellaneous properties.

The Tax Reform Act of 1986 eliminated benefits to investors from operating losses typically experienced by the Cardinal partnership properties during their developmental stages. The loss of those benefits, in turn, significantly impacted the Debtors' abilities to sell their products through syndication of the partnerships which owned the various properties. Although the evidence showed that the Debtors tried to develop other forms of their products which could be sold directly to third-party users, the primary focus continued to be the manufacture of modules which were developed into properties owned by limited partnerships organized by the Debtors. The reason given for that continued activity was a perception that investors would return to the real estate market after a temporary period of adjustment and would want to purchase investment interests in developed properties. The Debtors believed that if they had mature properties with positive cash flow available for sale when investor interest revived, they could capture a large share of that market.

Unfortunately, the market did not regenerate quickly and by 1989 one of the Debtors and a subsidiary were general and limited partners in some 450 of these company-owned unsyndicated partnerships. Further, most of the properties owned by those partnerships had not achieved positive cash flow, were not marketable, and required substantial cash infusion from their general partners. Indeed, testimony established that in February, 1989, 300 of those partnerships with apartment projects had income after normal operating expenses of only $3,200,000, although their monthly mortgage payments required $4,800,000. In fact, two members of the CII Committee are involved in a $25,000,000 unsecured loan extended to CII in mid 1988, apparently to aid in providing these and other operating costs. Without significant alternative markets for their manufactured products, the Debtors, as general partners, could not continue to provide the financial support required by the partnerships. The Creditors seriously question the wisdom of the Debtors' continued focus on the manufacture of cash-draining assets. And, indeed, that focus continued throughout much of 1988.

Sometime after the tax law changes, management of the Debtors determined that investors in some 250 syndicated partnerships formed prior to 1987 should be encouraged to continue and possibly extend their investments. That encouragement took the form of loans to those partnerships totalling approximately $11,369,000. The purpose for those loans was to reduce the impact on investors of the Tax Reform Act of 1986. The Creditors contend that the decision to benefit existing investors in that manner further drained the Debtors of cash and limited their ability to adjust to drastically changed circumstances.

The Creditors also allege that management failed to take timely steps to trim payroll and other overhead expenses of Cardinal, thereby unnecessarily prolonging the demand for cash at a time when liquid assets were shrinking.

The Debtors defend their continued manufacture as prudent at the time, based upon a reasonable expectation of resurgence in the market. They also point to longer maturity periods than expected in the newly developed retirement village sector of their market because of slowness by state regulatory bodies charged with approval of certain design features. The Debtors further believe the loans for tax equalization payments were good business decisions which were vindicated by the continued loyalty of existing investors. Finally, the Debtors point to substantial personnel cuts made in June of 1988 and thereafter, as well as continuing decreases in operating costs.

■ The Court believes that the Creditors' assertions are correct and that the Debtors' management not only failed to take timely and effective steps to prevent serious financial difficulties, but also authorized activities which aggravated and accelerated the consequences of existing problems. Although some attempts were made to diversify products and raise new capital, few meaningful successes occurred. Undoubtedly those pre-petition decisions in part drove CII and CIF into Chapter 11. Most Chapter 11 debtors have histories of past errors in judgment, however, so those mistakes alone should not be sufficient grounds to establish cause for the appointment of a trustee.

### B. *Specific Inappropriate Pre-Petition Actions*

Next, the Creditors assert that in 1989 CII took certain inappropriate pre-petition actions, constituting gross mismanagement which is cause for the appointment of a trustee. Most of those actions were the subject of testimony previously received by the Court in the Buckeye Adversary.

By February, 1989, CII realized it was short of cash for its normal operations. A meeting was scheduled for mid-February to inform secured lenders to the partnerships of the cash crisis and of CII's financial problems and to ask for a period of forbearance for partnership mortgage payments. To obtain cash to survive until that forbearance period could be achieved, CII's management, against the advice of its accountants, ordered its apartment management subsidiary to transfer to CII all cash received as rents from tenants of unsyndicated apartment projects after payment of normal operating expenses of the partnerships, other than the mortgage payments for February. CII contends that those partnerships were indebted to it for previously extended construction or operating advances. Without determining the legality of CII's action, the effect of that directive was to cause approximately 300 nonsyndicated apartment properties to default on their mortgages by missing their February mortgage payments. That action enraged the secured lenders to those partnerships, doomed the forbearance request and certainly undermined that constituency's confidence in the Debtors' management.

In early May of 1989 the Debtors again needed cash. This time a directive was issued by CII's management to transfer funds to it from syndicated partnerships which had available cash and owed money to a Cardinal entity. By mistake the $1,075,000 transferred in response to that directive was taken from the wrong partnerships. It is not yet clear to the Court whether the funds were taken from partnerships which had cash but were creditors of either the general partner or one of its affiliates, or whether the funds were taken from partnerships which owed the general partner, but did not have cash. Although the misdesignation was admittedly a mistake, that error was not corrected and confidence in the Debtors' ability to manage their affairs was further eroded.

The Creditors also maintain that the Debtors, as managing general partners of the partnerships, failed to cause those partnerships to segregate tenants' security deposits, thereby giving rise to potential claims against these estates aggregating in excess of $10,000,000. In response, the Debtors state that they have posted bonds in some states. It was not established that any bonds are actually in effect at this time or that such bonds would protect the estate

as well as the tenants. Many of those security deposits are not covered by bonds, however, and have been used by the partnerships for operating expenses.

Finally, in mid-May, 1989, a judgment creditor attempted to execute against CII's accounts at the Huntington National Bank ("HNB"). Despite serious financial problems, CII had continued to maintain several pooled disbursement accounts into which funds of various related entities were deposited pending disbursements to lenders or trade vendors. Upon receipt of the execution demand, HNB, which also is a creditor of CII, set off against its debt $9,200,-000 in 13 of CII's accounts. That sweep caused yet more mortgage defaults at the partnership level. Based upon representations made by CII, a state court found that $1,400,000 of the $9,200,000 had not belonged to CII and should not have been set off by HNB. Those funds were paid over to CII for the benefit of the owner entities. Instead of returning the funds to their owners, however, CII used those monies to repay loans extended by several subsidiaries in anticipation of the release of the $1,400,000. Testimony at trial further established that $500,000 of that $1,400,000 actually belonged to CII, contrary to representations made to the state court. CII's repayment of the loans from its subsidiaries occurred on May 16, 1989, and, therefore, may have constituted unauthorized post-petition transfers in payment of prepetition obligations. That action again decreased confidence in the Debtors' operations.

The Debtors do not dispute these factual allegations. They indicate that the February taking of partnership funds probably was an error in judgment, but was necessary if the Debtors were to continue to operate. The funds taken from syndicated partnerships in May are defended as appropriate except that the order was executed erroneously. The Debtors further justify payment to their subsidiaries of the funds returned by HNB by asserting that legal defenses exist to the characterization of those transfers.

■ At the time the Buckeye Adversary was tried, the two creditors' committees indicated an awareness of the problems created by these pre-petition actions, but chose to give the Debtors an opportunity to put those events behind them and move forward with their reorganization efforts. It was also clear to the Court that unless the committees supported the Debtors' position against the partnership lenders, there would be no estate for the benefit of unsecured creditors. Therefore, the committees' support of the Debtors during the Buckeye Adversary does not indicate agreement with those actions.

C. *Post–Petition Problems*

Since these bankruptcy cases were filed on May 15, 1989, the Creditors allege that management of the Debtors has failed to function properly in the Chapter 11 environment. Specifically, the Creditors charge that the Debtors have not responded adequately to data requests made by accountants for the CII committee, have not accurately either forecast their cash needs or reported their cash flow, have not provided accurate financial or corporate information, have not stemmed cash losses or accounting decreases in the value of their assets and have not adequately pursued disposition of unneeded marketable assets. The Creditors maintain the Debtors are unable to adapt realistically to their post tax reform circumstances and have lost direction or focus for their operations or for any future plan of reorganization. The Creditors also point to certain perceived conflicts of interest which they believe are hampering the reorganizational effort. In essence the Creditors think the Debtors are out of control generally and are not moving appropriately toward reorganization. According to the Creditors, an independent, objective third party is needed to restore momentum and stability to the reorganizational process.

1. Responsiveness to Data Requests And Communication With Committee Representatives

The accountants for the CII Committee have made various requests to CII for in-

formation necessary to carry out the tasks for which they were appointed. Those requests can be categorized generally as cash needs forecasts and cash usage reports which explain variances in that process, operational data from the partnerships which tracks budgeted income and expenses against actual income and expenses, profitability analyses for specific segments of operations, disclosure of unpaid post-petition payables at the corporate level and all unpaid payables and mortgage arrearages in the partnerships, reconciliation of cash flow reports with operating statements, records of intercompany transfers of cash, and supporting documentation for asset sales for which authorization is being sought from the Court.

The Debtors do not contest either the relevancy or appropriateness of the accountants' requests. However, they indicate that some of the requests would take a long time to satisfy and are unrealistic given recent decreases in accounting staff. The Debtors believe the CII committee accountants have failed to understand the nature of Cardinal's operations and that the various professionals have failed to communicate or cooperate properly.

It is generally uncontested that the first cash usage forecast, for the month of August, was not provided until September 6, 1989. That forecast was not correctly performed; line item variances were large and, for the most part, unexplained. A later forecast showed improvement in the process, but was not provided until October 30, 1989, although it was a forecast for the month of September. Such untimeliness generally invalidates the usefulness of the forecasts as a planning tool and, without explanation or understanding of specific variances, hampers the implementation of corrective action. For Debtors which continue to lose cash, the importance of this information cannot seriously be questioned. Further, because CII's system for forecasting cash needs is not compatible with its method of reporting actual cash usage, the benefits of accurate, timely forecasting of cash needs have not been available to these estates.

It also is not seriously contested that these Debtors are insolvent under § 101(31) of the Bankruptcy Code. The value thought to be available for unsecured creditors of these estates is to come primarily from repayment to Cardinal of significant receivables from the partnerships. Those repayments will require five to ten years. The Debtors' accountants have projected that if the secured debt of the properties can be restructured and the properties are left to mature, certain second mortgage notes, first mortgage differentials, operating advances and construction loans from Cardinal can be repaid from cash flow or from proceeds from the sale or refinancing of those properties at an appropriate time.

Sensitivity analyses of the ten-year cash-flow projections for the partnership properties, performed by the CII committee accountants, showed that the most important assumptions underlying those results may be the significant increases in rent and occupancy rates, coupled with decreases in operating expenses, projected for 1989 partnership operations. Accordingly, the committee accountants requested, on a consolidated basis, a comparison of actual partnership operations for 1989 with the 1989 budgeted income and expenditures. The Debtors were unable to furnish this information. Eventually individualized data was provided for fifty of the partnerships. The accuracy and reliability of the data furnished has been challenged and questions have been raised regarding its support of the projected increases in rent and occupancy rates upon which the ten-year cash-flow projections depend.

The CII committee accountants also have requested other data from the Debtors, including analyses of the profitability of segments of operations, listings of unpaid post-petition payables, reports of intercompany cash transfers, and comparative rent and occupancy data for partnership properties. While some of those requests have been satisfied, other data was never provided or was provided either late or in an incomplete fashion.

The CIF Unsecured Creditors' Committee's complaint in this area is that it has received no meaningful communication from the Debtors. Until these motions were filed, it appears that no representatives of either Debtor had met with the CIF committee.

### 2. Record Keeping

Another area of concern throughout these cases has been the quality of the Debtors' record keeping. The Debtors have experienced considerable difficulty in providing accurate information to the Court or to interested parties concerning their financial affairs. It appears that entity distinctions often were not observed. Operating reports filed with the Court and supplied to the United States Trustee have contained many inaccuracies and have required significant amendments. It has been very difficult for parties to understand the Debtors' financial status or to monitor their operations.

More seriously, it was established that the Debtors' general ledgers are grossly inaccurate with regard to booking the ownership of assets. Almost all the assets shown on the original and amended bankruptcy schedules of CIF, including a manufacturing facility, an office complex, a house, and numerous leases of equipment, are actually owned or leased by CII or its primary shareholder. An airplane shown on the original CIF schedules, but sold prior to the filing of the amended schedules, was also owned by CII. A dispute has developed relating to the ownership of what was represented on the CIF schedules as a wholly owned subsidiary of CIF. Similarly, when CII proposed the sale of a manufacturing plant in Atlanta, parties were later surprised to learn that the plant itself was owned by a Cardinal subsidiary which is not a Chapter 11 debtor.

Because of the unreliability of the Debtors' books and records, the CIF Unsecured Creditors' Committee has been protecting and monitoring assets which may not be part of CIF's estate. The Debtors knew those assets were incorrectly listed prior to the recent amendment of their schedules, but failed to correct those inaccuracies.

Awareness of the inaccuracies came primarily as a result of investigation prompted by requests from counsel to the CIF committee.

Again, the Debtors defended the state of their corporate records. Those defenses include inadvertent error, severe cuts in necessary staff personnel or actions taken on the advice of counsel. At this point, however, the most charitable observation available to the Court is that parties should not rely on the Debtors' schedules, reports or records for material disclosures of assets or liabilities.

### 3. Continuing Losses

From its bankruptcy filing through October 31, 1989, CII has sustained cash losses of approximately $1,600,000. That figure does not include at least $3,400,000 in unpaid professional fees and $565,000 in other payables. The total for CII alone could not be provided by that debtor other than on a consolidated basis and was finally calculated by the CII committee accountants. The total does not include losses in value of CII's partnership interests through depreciation, increased mortgage arrearages or other unpaid post-petition partnership payables. Nor does it include any losses erroneously attributed to CIF.

Cash losses since filing have not been specifically calculated for CIF. The operating reports for CIF are unreliable, however, given the inaccuracy in asset allocations. Creditors of that estate probably cannot tell how the cash position of CIF has changed since its bankruptcy filing.

The Creditors are understandably disturbed by the Debtors' inabilities to stem their continuing losses even though significant post-petition cutbacks have occurred in personnel, personnel benefits, facilities and equipment lease obligations. Although personnel cuts appear generally to have been overdue, the decreases in accounting staff during the consolidation of the Debtors' accounting systems from a regional to a centralized system may have resulted in increased errors in financial data which may be more costly to correct.

It is not contested that losses have continued. The Debtors believe the problem is being rectified, however, although admittedly at a slower pace than is desired. They believe that break-even will be reached during the first quarter of 1990.

#### 4. Asset Dispositions

The Creditors allege that the Debtors have been unreasonably slow to market or sell unneeded assets, reject executory contracts and leases or take other steps needed to bring cash into the estates. On the other hand, the Debtors state that such sales require significant time to conclude, faster sales at lower prices will not benefit anyone, and using outside brokers is not justified.

The Debtors have closed three of their five factories and have idled the remaining two. The sale of one factory facility has been proposed, but has not been closed. Sales of new products since the bankruptcy filings in May have been minimal, although the idled plants resumed production on a very limited basis recently. The corporate jet was sold.

A primary source of immediate operating cash, other than through upstreamed subsidiary profits, was to come from the sale of 100 to 125 matured unsyndicated apartment properties. That sale process has been slow, however, partly because market conditions may not be especially favorable and partly because the Debtors have focused on large packages of sales to institutional buyers. None of those sales have come to fruition. Nor have there been any sales from contracts not in existence at the time these Chapter 11 cases were filed. Recently, some smaller sales are beginning to be proposed, but progress has not been at the rate needed to prevent continued cash drain. In the Court's view, the process has been slowed by the Debtors' failure to compile necessary and reliable financial data for prospective purchasers to review. The Court further believes that the process has been hampered by the Debtors' failure to make supporting documentation available on a timely basis for review by the CII committee accountants once a potential purchaser has been proposed for the Court's limited approval.

The Creditors further complain of the Debtors' unwillingness to vary from a pricing formula which may be unrealistic in a Chapter 11 setting and their unwillingness to employ outside brokers to locate potential purchasers. Whether meaningful sales could be obtained at lower prices is not known. No such sales were the subject of testimony. Nor will the Court find, based on the record in this matter, that outside brokers would be cheaper or more likely to find appropriate purchasers. However, sales of assets have not proceeded at a rate sufficient to offset cash drains on the Debtors or to permit them to remain current on post-petition obligations, including professional fees.

#### 5. Conflicts of Interest

Although the Creditors did not identify specific instances where conflicts of interest influenced the Debtors to take otherwise inappropriate actions, several areas were raised where the appearance of conflicts has been manifested.

First, the founder, primary shareholder and former president of CII and his spouse have personally guaranteed obligations of Cardinal or its affiliated partnerships in the face amount of $120,000,000 to $150,000,000. While there is no indication that those guarantees have influenced any workout or deeds in lieu process, unless releases of those guarantees are negotiated, the guarantors' interests will be served by retaining partnership properties until the guaranteed mortgage debts can be repaid, whether or not such retention results in repayment of receivables to Cardinal for the benefit of unsecured creditors of these estates. And while accurate records of partnership expenses, payables, and income could allow the Creditors to determine whether their concerns regarding conflicts are justified, without those records the potential conflicts further erode confidence.

There are other conflicts in these cases, primarily between CII and certain subsidiaries which hold claims against it or which are involved in transactions where necessary independence is not present. One

such problem surfaced in the proposed allocation of proceeds between CII and Cardinal Industries of Georgia., Inc. ("CIGI") when the Atlanta plant facility was proposed to be sold. During that process the proposed allocation of proceeds changed significantly in CII's favor. CIGI's representative when that reallocation was made was also an officer and director of CII. Because actions of these Debtors often ignore or blur separate entity distinctions, potential for conflict is especially evident.

### 6. Focus and Plan Proposal

In September the exclusivity periods were extended to give both Debtors additional time to concentrate on and conclude negotiations with partnerships lenders so that any plan proposed would be feasible. Those extensions, until November 22, 1989, have temporarily been further extended by agreement of the parties until disposition has been made of these motions for the appointment of a trustee. If these motions are denied, the focus undoubtedly will shift to the exclusivity issue.

The Debtors have not developed reliable independent sources of income apart from the sales of existing partnership properties. It is uncertain whether manufacturing will continue and there is disagreement regarding both the need to maintain future capacity for that function and the level at which that function can be profitable. There are unfinished properties for which modules may be needed if funding becomes available to complete those construction projects. Recently, after the Debtors obtained two contracts for pre-sold modules, manufacturing resumed on a limited basis to fill those contracts. That resumption is justified according to the Debtors, but challenged by the Creditors. The Creditors further believe that idling plants rather than closing and marketing those facilities further drains the estate. While the Court believes some flexibility may be important in this area, the time is very close when the Debtors either must bring in significant contracts for new manufactured products or must terminate that phase of their business. The estate should not be asked to bear the cost of maintaining that option unless it is clear that manufacturing is viable.

If the Debtors' plans of reorganization are to be consensual ones which contemplate ongoing business enterprises, rather than mere holding operations for preserving partnership properties until sales or refinancings occur, the form of those future operations should be taking place. That does not appear to have occurred and the focus of the Debtors' business operations and the structure of any plan is somewhat unclear. The motel and apartment management subsidiaries are being considered for possible sale. The single family housing product line is not self-sustaining, new student housing contracts are not in place, and other alternatives have not been presented to the Court.

The Debtors' accountants indicated that momentum and success in negotiations with partnership lenders is a prerequisite to the development of later strategies to restructure the Debtors' businesses. In the early fall of 1989 that hoped-for momentum appeared to be developing. However, on or about November 9, 1989 the Debtors requested their bankruptcy counsel to withdraw from representation. At the same time the Debtors used funds in a subsidiary, previously represented as restricted funds, to retain new counsel for several operating subsidiaries. The Debtors also sought to employ that counsel to represent them in these Chapter 11 cases generally. Because those subsidiaries are not in Chapter 11 and had significant claims against these Debtors, that employment was not approved by the Court. The Debtors were permitted to employ that new counsel as special counsel to defend these trustee motions, however. Uncertainty about counsel, the concurrent suspension of involvement with lender negotiations by the Debtors' accountants and the impact of the pendency of these motions have stalled the negotiating process and have dissipated the momentum. To the extent such upheaval is attributable to actions taken by the Debtors, the Creditors point to those actions as further evidence of lost focus and inappropriate corporate decision making.

## II.  ISSUES

The only issue before the Court is whether the facts proven by the Creditors either require the Court to order the appointment of a trustee for cause pursuant to 11 U.S.C. § 1104(a)(1) or demonstrate that the appointment of a trustee would be in the interests of creditors and other parties pursuant to 11 U.S.C. § 1104(a)(2).

## III.  DISCUSSION

■ The appointment of a trustee in a Chapter 11 case is an extraordinary remedy. If the Creditors are to prevail, the right to such remedy must be shown by clear and convincing evidence. *Official Creditors' Committee v. The Liberal Market, Inc. (In re The Liberal Market, Inc.),* 13 B.R. 748 (Bankr.S.D.Ohio 1981). The standards by which the appointment is governed are set forth in Section 1104 which states:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.

A. *Appointment of a Trustee for Cause Pursuant to 11 U.S.C. § 1104(a)(1)*

■ The examples of cause enumerated in § 1104(a)(1) are not exhaustive; the Court may find that cause exists for a reason not specifically set forth in the statute. *In re Ford,* 36 B.R. 501 (Bankr.W.D. Ky.1983).

■ Finding cause to order the appointment of a trustee would be simple had there been clear evidence of dishonesty or fraud on the part of the Debtors' management. Other than the highly contested allegations of possible perjury through representations contained in the CIF amended schedules, however, fraud or dishonesty was not part of the Creditors' case. Because determination of that credibility issue carries grave implications for the participants if the Court's assessment is in error and because resolution of that matter is not necessary to the ruling on the motions, the Court will not find that cause has been established for fraud or dishonesty.

■ The Court also will not base a finding that cause exists for the appointment of a trustee solely upon management's incompetence or gross mismanagement. Certainly some of the Debtors' prepetition actions were highly questionable and there were numerous examples of mismanagement by inadequate control over administrative and financial systems. However, the evidence of incompetence or gross mismanagement is not sufficient to support the appointment of a trustee premised upon those grounds alone.

■ The fundamental problem in these cases is that there has been a serious and general loss of confidence in the Debtors' management. The alleged loss of confidence does not appear to the Court to be a ploy, but follows good faith efforts by the Creditors to permit the Debtors to direct their own reorganizations. The confidence problem has not resulted from one specific problem, but came about because of many events which, when seen in combination, make it appear that the Debtors are not properly in control of their reorganizations and should no longer be permitted to direct the process. Factors leading to this loss of confidence include decisions after the Tax Reform Act to continue the construction of projects and to extend loans to existing partnerships to equalize the tax treatment

of investors at a time when the Debtors' cash reserves were being depleted by ordinary operations. Those factors further include specific pre-petition actions such as directing the payment of February, 1989 mortgage payment monies to the general partner, erroneously repaying loans from monies held by partnerships which either did not owe Cardinal or did not have those funds, failing to properly segregate partnership funds, particularly security deposits, and using funds returned by HNB to repay subsidiaries where either the loan repayments or the initial use of those loaned funds appeared ill-advised.

That loss of confidence increased greatly after the Debtors failed to respond timely or accurately to data requests, failed to keep accurate or complete financial records or corporate books, continued to lose cash, and unduly delayed marketing assets or providing appropriate documentation for assets sought to be sold. Further erosion resulted from the continued appearance of certain conflicts of interest and a lack of strong direction or objective assessment of future plans for specific segments of the businesses, including manufacturing, syndication, the motel chains, property management services and new products for direct sales.

Finally, just when operations appeared to be beginning to stabilize and momentum was developing in workout negotiations with secured lenders to the partnerships, the Debtors not only fired the legal counsel which had contributed significantly to those positive developments, but also paid a retainer to replacement counsel at a time when other professionals were not being paid on a current basis. Such action caused considerable turmoil and contributed to the suspension of valuable assistance by the Debtors' accountants.

Perhaps none of the facts cited above, standing alone, would rise to the level of cause for the appointment of a trustee. Collectively, however, those facts have caused loss of confidence in the Debtors' management of crisis proportions. That crisis of confidence is cause which requires this Court to order the appointment of an independent trustee pursuant to 11 U.S.C. § 1104(a)(1)

**B.** *Appointment of a Trustee in the Interests of Parties Pursuant to 11 U.S.C. § 1104(a)(2).*

Even if cause is not established within the meaning of § 1104(a)(1), the Court may order the appointment of a trustee under § 1104(a)(2) if the interests of creditors and other interests of the estate would be served thereby. If appointment is ordered pursuant to the Court's general equitable powers under § 1104(a)(2), the cost of a trustee to the estate, when compared with the benefit sought to be derived, will be a significant aspect of that determination. *See In re Stein and Day, Inc.,* 87 B.R. 290, 295 (Bankr.S.D.N.Y.1988); *In the Matter of Parker Grande Development, Inc.,* 64 B.R. 557, 561 (Bankr.S.D.Ind.1986).

The Court believes the interests of all parties to these cases will be served by the presence of an independent trustee. The presence of a trustee will provide secured creditors of these Debtors and of the partnerships with an objective party to decide whether to keep, sell or abandon particular assets. Unsecured creditors will have a party who is sensitive to the fiduciary duties owed to all constituencies. The United States Trustee may be able to receive more accurate and timely financial reports. Potential purchasers of assets of Cardinal or its affiliated partnerships will have a disinterested and dispassionate party on the other side of the negotiating table. Limited partner investors in the syndicated partnerships will have a chance to voice their needs. And finally, if the right person is selected, the Court will have an objective and realistic party to determine whether there is an estate of sufficient value to justify the time and resources expended on these cases.

Secured lenders to the Cardinal partnerships are being asked to restructure their loans. The professionals appointed in these cases are being asked to continue to provide services and wait for payment of their administrative claims. Limited part-

ner investors are being asked to continue the Debtors as managing general partners of the partnerships. And unsecured creditors are being asked to wait five to ten years for the Debtors to receive payments of receivables from the partnerships which will form the basis for any distribution of dividends. All these requests are premised upon the Debtors' representations that such delay will result in the realization of value for all parties.

The Debtors may be correct in their assertions. Or the Debtors may be wrong and the assumptions they have made about the value of those partnership properties may be in error. The justified loss of confidence by all parties in the accuracy or completeness of financial information generated by these Debtors means those requests are being made without providing parties the data which is necessary to determine whether the requested actions or forebearances are in their best interests. In seven months, even in cases of this magnitude, the Court believes basic reliable data should have been provided to answer these questions posed by interested parties. Although the evidence established that the Debtors have recognized serious deficiencies in their record keeping processes since 1985, those failures have not been properly addressed. Accordingly, the Court has no basis to conclude that such deficiencies will soon be corrected.

Moreover, it is inescapable that the Unsecured Creditors' Committees of CII and CIF have lost faith in the Debtors' intentions and abilities to reorganize their affairs. That loss of faith is supported by facts established by evidence. No matter how much this Court might wish events were otherwise so that the trauma and risk of a trustee might be avoided, that loss of confidence has occurred and is justified. And denial of the motions will not reestablish trust or confidence. Essentially, these cases are at a standstill and the present state of the Debtors' affairs prevents the cases from progressing. Continued inability to move forward will jeopardize whatever chance exists to realize the potential values of these estates.

Both Debtors are insolvent. Accordingly, what value exists belongs to creditors and the interests of CII's two shareholders are secondary to the concerns of creditors. Since the Creditors, which hold unsecured debts, are willing to risk the costs, uncertainties and dislocations occasioned by the appointment of a trustee, the Court will exercise its equitable powers to order that appointment.

The Court also finds that the cost of a trustee should not exceed the benefit provided. Given the change of counsel and the current position of these estates, substantial expenditure of estate funds would be required to familiarize new counsel with the cases. Further, if it is possible for the Debtors to regain the confidence of all parties, that effort could be difficult and possibly expensive. The costs and expenses of a trustee should not be higher than those alternative costs would be, and the value of the protection afforded should be greater. Accordingly, appointing a trustee should serve the financial interest of all parties to these cases.

These findings are not meant to discourage current management. It is clear to the Court that both Austin Guirlinger and Paul Jarvis have exceptional skills and knowledge related to Cardinal's operations. Both men are also persons of integrity who have worked hard. Their talents should be retained and utilized by any appointed trustee. The Court further hopes that both men will remain with the companies and will support the trustee in developing a plan of reorganization which is in the best interests of all constituencies. The Court challenges all parties to work together in evaluating the feasibility of reorganizing these businesses through the development of new markets or products and examining the ability of future sales or refinancings of partnership projects to produce funds for the estates. The Court remains optimistic that cooperative efforts will occur, that the parties will agree regarding the direction these cases should take, and that the serious accounting deficiencies, communication breakdowns and record keeping problems which have caused such a lack of confidence will be overcome.

768

## IV. CONCLUSION

Based upon the foregoing, the Creditors' motions for the appointment of a trustee should be, and the same hereby are, sustained. The United States Trustee is ordered to appoint a trustee in each of these cases. Such trustee shall be appointed, subject to the approval of the Court, for the benefit of all constituencies and shall be an objective, impartial person open to any reasonable course of action which will benefit these estates. Such trustee shall solicit the cooperation of all parties, including current management, counsel for various secured lenders, counsel and representatives of the unsecured creditor bodies, partnership investors with claims against these Debtors, equity holders, and professionals. In addition to the duties enumerated in 11 U.S.C. § 1106, such trustee shall report orally to the Court and interested parties at each biweekly status conference. Although the Court is assuming that the same person will serve in both cases, if the United States Trustee, in consultation with the parties, believes the same person cannot serve as trustee for both estates, that determination will be acceptable to the Court.

IT IS SO ORDERED.